Cheryl A. Williams (Cal. Bar No. 193532)
Kevin M. Cochrane (Cal. Bar No. 255266)
caw@williamscochrane.com
kmc@williamscochrane.com
WILLIAMS & COCHRANE, LLP
28581 Old Town Front Street
Temecula, CA 92590
Telephone: (619) 793-4809

Attorneys for Plaintiff
BERRY CREEK RANCHERIA

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **BERRY CREEK RANCHERIA OF MAIDU INDIANS OF CALIFORNIA**, a federally-recognized Indian tribe,<br><br>Plaintiff,<br><br>vs.<br><br>**DEBORAH HOWARD**, a/k/a DEBORAH BROWN; **JESSE BROWN**; and **DOES 1 THROUGH 10**;<br><br>Defendants. | Case No.: _____<br><br>**COMPLAINT FOR DAMAGES & OTHER MONETARY RELIEF**<br><br><u>**JURY TRIAL DEMANDED**</u><br><br>**[ACTION FILED OCT. 22, 2020]** |

Case No.: _____

COMPLAINT OF BERRY CREEK RANCHERIA

## INTRODUCTION

1. This action concerns a continuing pattern of fraud and money laundering at the federally-recognized Berry Creek Rancheria of Maidu Indians of California ("Berry Creek" or "Tribe") by two former in-house professionals who were entrusted to look after its financial and business affairs. As to that, Berry Creek separately hired a woman named Deborah Howard ("Ms. Howard") to serve as its Chief Financial Officer and a man named Jesse Brown ("Mr. Brown") to act as its Tribal Administrator. However, at some point in time on or before the start of 2011, these two individuals who have since married entered into a discreet personal relationship and used their resultant joint power to supervise both the finances and business affairs of the Tribe to carry out a scheme centered around misappropriating tribal assets on a grand scale. Ms. Howard and Ms. Brown did this in four unique ways that the General Allegations section of this Complaint will discuss in significant detail: by (1) issuing a secret credit card to Mr. Brown on which they would make more than $1.3 million in personal expenditures; (2) misappropriating over $200,000 in cash withdrawals over the course of five Holiday seasons that were meant to provide Christmas gifts to tribal youth; (3) skimming more than $1.1 million of cash receipts from the Smoke Shop operated by Berry Creek before depositing the remainder of the funds into the Tribe's bank account; and (4) giving themselves upwards of $250,000 in unauthorized payroll distributions by manipulating the system managed by Ms. Howard. This course of conduct went on for years, involved thousands of individual transactions, and was only discovered long after Ms. Howard and Mr. Brown's departures from the Tribe in 2017 when the bank finally disclosed the existence of the aforesaid credit card (after first informing the Berry Creek Tribal Council that its members could not access the account because Ms. Howard and Mr. Brown were the only authorized individuals). None of this activity was authorized, and all of it should serve as a basis for Berry Creek obtaining treble damages or more under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*., and assorted California tort claims.

///

COMPLAINT OF BERRY CREEK RANCHERIA

**JURISDICTION**

2. The district court has jurisdiction over this action pursuant to RICO, 18 U.S.C. § 1961 *et seq*., 28 U.S.C. § 1331 ("Federal Question Jurisdiction"), and 28 U.S.C. § 1367 ("Supplemental Jurisdiction").

3. Venue is appropriate in the Eastern District of California under Section 1965(a) of RICO and Subsection (b)(1) of the general venue statute since all Defendants reside within this District. *See* 18 U.S.C. § 1965(a) (explaining a RICO action may be instituted against a person in any district in which "such person resides, is found, has an agent, or transacts his affairs"); 28 U.S.C. § 1391(b)(1) (explaining "[a] civil action may be brought in – (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located"). Further, venue is also appropriate in this District since – as the general allegations shall explain – "a substantial part of the events giving rise to the claim[s set forth herein] occurred" in this District. 28 U.S.C. § 1392(b)(2).

4. This action presents an actual and live controversy as to whether the Defendants formed an enterprise to engage in a pattern of racketeering activity – consisting of fraud, money laundering, and other predicate acts – which the district court has the power to redress in accordance with the Prayer for Relief, *infra*.

**PARTIES**

5. The Plaintiff Berry Creek Rancheria of Maidu Indians of California is a federally-recognized Indian tribe listed as such in the Federal Register notice entitled "Indian Entities Recognized by and Eligible to Receive Services from the United State Bureau of Indian Affairs" that was published on January 30, 2020. *See* 85 Fed. Reg. 5462 (Jan. 30, 2020). Berry Creek's Reservation is situated in Butte County just outside the eastern city limit of Oroville, and thus the Tribe is located in the Eastern District of California for purposes of venue.

6. The Defendant Jesse Brown is a resident of the State of California who is domiciled in the City of Oroville and thus resides in the Eastern District of California for pur-

poses of venue. Further, Mr. Brown also owns and operates a business named The Exchange along with Deborah Howard a/k/a/ Deborah Brown, which is located at 1975 Montgomery Street, Oroville, California 95965.

7. The Defendant Deborah Howard a/k/a Deborah Brown is a resident of the State of California who is domiciled in the City of Oroville and thus resides in the Eastern District of California for purposes of venue. Ms. Howard also owns and operates a business named The Exchange along with Jesse Brown, which is located at 1975 Montgomery Street, Oroville, California 95965. Additionally, Ms. Howard also owns and operates another business named The Makeup Room & Company, which is located at 860 Hazel Street, Gridley, California 95948.

## GENERAL ALLEGATIONS

### I.   BACKGROUND ON MS. HOWARD AND MR. BROWN

8. The Berry Creek Rancheria is a federally-recognized Indian tribe that is governed by its General Council, otherwise known as all members of the Tribe who are eighteen (18) years of age or older.

9. The powers of the General Council are explicitly set forth within the Articles of Association of the Berry Creek Rancheria, and include the powers to, *inter alia*, "establish rules or procedures for the conduct of its affairs" and "administer Berry Creek Rancheria assets and to manage all economic affairs and enterprises of the Berry Creek Rancheria."

10. The General Council meets on a regular basis (typically monthly), and when it is not in session a four-person Tribal Council represents Berry Creek and carries out any directives issued by the General Council. However, the day-to-day management of Berry Creek rests with certain in-house professional who occupy executive positions within the Tribe.

11. The two highest-ranking executive officers for Berry Creek are the Chief Financial Officer ("CFO") and the Tribal Administrator ("TA"). As the title of the former implies, the CFO is charged with overseeing the day-to-day accounting functions for both

3                          Case No.: _____

the Tribe and its subordinate non-gaming business enterprises (*i.e.*, Smoke Shop, Convenience Store, RV Park, and Bowling Alley), as well as supervising any inferior fiscal employees. The TA, on the other hand, is akin to the manager of a non-profit organization who carries out the policy goals and objectives of Berry Creek while overseeing all non-fiscal employees of the Tribe and the aforesaid subordinate non-gaming business enterprises.

12. Deborah Howard was hired by the General Council to serve as the CFO for Berry Creek on or about July 1, 2002.

13. Jesse Brown was subsequently hired by the General Council to serve as the TA for Berry Creek on or about September 11, 2006.

14. By the beginning of 2011 at the latest, Ms. Howard and Mr. Brown entered into a personal relationship, which is something they not only failed to disclose to the Tribe, but actively hid throughout the remainder of their time at Berry Creek.

15. Almost immediately after starting this personal relationship, Mr. Howard and Mr. Brown conspired to and did carry out a plan to use their paramount executive positions at Berry Creek to enrich themselves personally through the misappropriation of Tribal assets.

## II. THE RICO ENTERPRISE CONSISTING OF FOUR INTERCONNECTED SCHEMES OF FRAUD AND MONEY LAUNDERING

16. This scheme to fraudulently misappropriate tribal assets has at least four different components, each of which will be discussed in turn in the subsections below. In short, these components are the abuse of (1) a secret Tribal credit card, (2) monetary withdrawals meant to serve as Christmas gifts for tribal children, (3) cash receipts at the Smoke Shop intended for deposit in the Tribe's bank account, and (4) the payroll system by authorizing additional payroll payments above and beyond their normal salaries.

### A. Credit Card

17. At the beginning of 2011, Ms. Howard issued Mr. Brown a tribal credit card in Berry Creek's name, the sort that should have only been used for making government-

tal/business purchases. However, Ms. Howard issued this card on the sly without tribal authorization, and its real purpose was *not* to cover purchases incident to Mr. Brown carrying out the functions of his job as TA, but instead to support their burgeoning lavish lifestyles.

18. To that end, this discreet credit card was used to cover all sorts of exorbitant personal expenditures, many of which are entertainment or travel-based in nature. These purchases relate to everything from premiere concert tickets for both a rapper named G-Eazy and a country western singer named Kenny Chesney, to getaways to Napa and Calistoga, to stays at (presumably) the penthouse suites at some of the finest casinos in Las Vegas. Despite the varying descriptions, one thing that all of these purchases have in common is that all of them were either done over the telephone, over the internet, or in-person at businesses that in turn used a point of sale system connected to the internet to complete the transaction.

19. As just the first of many examples, for the one-month period of mid-April to mid-May 2016, Mr. Brown and Ms. Howard used this credit card to buy tickets for the aforementioned G-Eazy concert, rent an $800 limousine, and cover two one-night stays at the Marriott Desert Springs in Palm Desert, California to the tune of $2,202.46 and $1,756.19, respectively.

| Post Date | Trans Date | Ref # | Transaction Description | Amount |
|---|---|---|---|---|
| 04/18 | 04/16 | 9352 | TM *G-Eazy 415-421-8497 CA | $318.60 |
| 04/26 | 04/25 | 0021 | Big Cat Limousine 530-534-8875 CA | $800.00 |
| 05/02 | 04/30 | 6143 | Marriott La Jolla La Jolla, CA 04/30/16 for 01 Nights Folio: 009932 | $263.75 |
| 05/04 | 05/03 | 0548 | Marriott Desert Springs Palm Desert CA 05/03/16 for 01 Nights Folio: 004671 | $2,202.46 |
| 05/04 | 05/03 | 0555 | Marriott Desert Springs Palm Desert CA 05/03/16 for 01 Nights Folio: 004670 | $1,756.19 |

Case No.: _____
COMPLAINT OF BERRY CREEK RANCHERIA

20. Just a few months prior, during the month of December 2015, Mr. Brown and Ms. Howard used this tribal credit card to cover, *inter alia*, the costs associated with an early Christmas getaway to the Mandalay Bay in Las Vegas and a New Year's trip to Heavenly Ski Resort in South Lake Tahoe.

| Post Date | Trans Date | Ref # | Transaction Description | Amount |
|-----------|-----------|-------|------------------------|--------|
| 12/15 | 12/13 | 4804 | Mandalay – Front Desk Las Vegas, NV 12/11/15 for 02 Nights Folio: 0038681480 | $445.38 |
| 12/15 | 12/13 | 3914 | Mandalay – Front Desk Las Vegas, NV 12/11/15 for 02 Nights Folio: 0038771391 | $443.92 |
| 12/15 | 12/14 | 1021 | Foothill Grooming  Oroville, CA | $314.00 |
| 12/16 | 12/14 | 2609 | Mandalay – Front Desk Las Vegas, NV 12/11/15 for 03 Nights Folio: 0039390260 | $4,000.47 |
| 12/21 | 12/19 | 6484 | Table Mountain Valero Oroville, CA 05/03/16 for 01 Nights Folio: 004670 | $46.92 |
| 12/24 | 12/22 | 9405 | Shell Oil 574445966706 Oroville, CA | $65.03 |
| 12/24 | 12/23 | 3623 | Chevron 00376784 Oroville, CA | $30.40 |
| 12/24 | 12/23 | 3746 | Chevron 00376784 Oroville, CA | $54.16 |
| 12/24 | 12/23 | 3406 | Freeway 76 Oroville, CA | $42.30 |
| 01/04 | 01/03 | 2448 | Foothill Grooming Oroville, CA | $542.00 |
| 01/04 | 12/30 | 5812 | Heavenly North Face 80 So Lake Tahoe, CA | $2,176.48 |
| 01/04 | 12/30 | 5838 | Heavenly North Face 80 So Lake Tahoe, CA | $140.40 |
| 01/04 | 12/30 | 7735 | Heavenly Sports Cecils So Lake Tahoe, CA | $428.76 |

21. The calendar year of 2015 was rife with similar credit card purchases. For instance, from mid-August to mid-September 2015, Mr. Brown and Ms. Howard made a $12,000 charge at the Bellagio Hotel in Las Vegas as well as purchases totaling nearly $9,000 and $7,000 for a Disneyland trip and Ultimate Fighting Championship ("UFC") tickets, respectively. Again, a sample of some of the larger charges for this time period is set forth below:

///

| Post Date | Trans Date | Ref # | Transaction Description | Amount |
|---|---|---|---|---|
| 08/21 | 08/19 | 4243 | Bellagio Hotel & Casino Las Vegas, NV | $12,326.87 |
| 09/02 | 08/31 | 7211 | Disney Resort-WDTC 714814554 CA | $5,937.50 |
| 09/03 | 09/01 | 4454 | Florida Magic DLR – 0 9999999999 CA | $1,028.54 |
| 09/03 | 09/02 | 8345 | Evans Furniture Gallery Chico, CA | $1,148.51 |
| 09/09 | 09/07 | 3244 | Disney Resort- Disney Anaheim, CA | $1,668.73 |
| 09/11 | 09/10 | 0191 | TM *Ultimate Fighting 865-512-6326 CA | $1,273.20 |
| 09/11 | 09/10 | 0209 | TM *Ultimate Fighting 865-512-6326 CA | $2,567.80 |
| 09/11 | 09/10 | 0217 | TM *Ultimate Fighting 865-512-6326 CA | $3,116.90 |
| 09/16 | 09/15 | 0022 | Lux Vacation Homes San Mateo, CA | $5,000.00 |
| 09/17 | 09/16 | 8394 | IN *Bolenology LLC D/ 707-2947540 CA | $3,783.60 |

22. Much the same happened during the month of February 2015, as there was an $11,000 purchase at the Aria Hotel in Las Vegas as well as other purchases totaling more than $1,000 at the Amizetta Estate Wintery in Saint Helena, the Calistoga Ranch, Verismo Wines, Ticketmaster for a Country Mega Ticket concert, Louis Vuitton, and Ticketmaster yet again for a NASCAR race in Las Vegas. Again, some of the more exorbitant credit card charges for this single month are set forth in the table below:

| Post Date | Trans Date | Ref # | Transaction Description | Amount |
|---|---|---|---|---|
| 02/02 | 01/31 | 0041 | Amizetta Winery Saint Helena, CA | $1,607.04 |
| 02/02 | 01/30 | 3835 | Wood Brothers Carpet 530-345-2438 CA | $3,514.00 |
| 02/02 | 02/01 | 1456 | Calistoga Ranch Calistoga, CA | $1,743.34 |
| 02/03 | 02/01 | 1464 | Calistoga Ranch Calistoga, CA | $278.61 |
| 02/03 | 02/01 | 8529 | Verismo Wine-Ecommerce Napa CA | $3,014.67 |
| 02/03 | 02/01 | 8552 | Verismo Wine-Ecommerce 707-2240191 CA | $1,620.00 |
| 02/05 | 02/03 | 1320 | Napa Valley Tours & TR Napa, CA | $702.25 |
| 02/06 | 02/05 | 6705 | TM *Country MegaTicket 415-421-8497 CA | $1,610.50 |
| 02/09 | 02/06 | 1113 | Aria – Front Desk Las Vegas, NV | $777.00 |
| 02/10 | 02/09 | 1302 | TM *Terry Fator 865-512-6326 CA | $336.26 |
| 02/13 | 02/12 | 0100 | Best Buy 00001917 Chico CA | $4,183.39 |
| 02/17 | 02/13 | 6591 | Louis Vuitton #36 Beverly Hills, CA | $2,983.56 |
| 02/17 | 02/13 | 1297 | Mandalay Bay Box Office Las Vegas, NV | $467.64 |
| 02/23 | 02/20 | 0606 | Aria – Front Desk Las Vegas, NV | $11,287.30 |
| 02/26 | 02/25 | 8674 | Briggs Firestone Inc. Oroville, CA | $2,320.21 |

Case No.: _____
COMPLAINT OF BERRY CREEK RANCHERIA

| 03/02 | 02/28 | 5962 | TM *Kobalt 400 – NASCAR 800-653-8000 CA | $1,652.45 |
|---|---|---|---|---|

23. And yet, another example of this credit card abuse is evident from the purchases between mid-November and mid-December 2014, during which time Mr. Brown and Ms. Howard spent more than $15,000 at Louis Vuitton during a luxurious Las Vegas getaway that also involved a $3,500 stay at the MGM Grand, buying tickets to a Miguel Cotto boxing match at the Mandalay Bay for $4,130, and purchasing tickets for an upcoming Kenny Chesney concert for $3,768. Again, the table below depicts some of the larger credit card charges during this time period:

| Post Date | Trans Date | Ref # | Transaction Description | Amount |
|---|---|---|---|---|
| 11/19 | 11/18 | 1003 | St. Regis San Francisco San Francisco, CA | $2,066.44 |
| 11/23 | 11/20 | 9639 | Louis Vuitton #163 Bell Las Vegas, NV | $2,448.47 |
| 11/23 | 11/20 | 8995 | Louis Vuitton #163 Bell Las Vegas, NV | $7,632.50 |
| 11/23 | 11/21 | 6864 | Louis Vuitton #142 Las Vegas, NV | $5,746.60 |
| 11/23 | 11/22 | 4474 | TM *Miguel Cotto 865-512-6326 CA | $4,130.40 |
| 11/24 | 11/22 | 4956 | MGM Grand Hotel Las Vegas, NV | $3,460.29 |
| 12/03 | 12/02 | 0030 | Lux Vacation Homes San Mateo, CA | $6,352.00 |
| 12/03 | 12/02 | 2347 | TM *Kenny Chesney 415-421-8497 CA | $3,768.25 |
| 12/07 | 12/04 | 7578 | Rabo Health and Wellness 530-8466262 CA | $2,000.00 |
| 12/14 | 12/11 | 7740 | TM *Kenny Chesney 877-446-9450 CA | $812.22 |

24. This complaint could devote *countless* paragraphs to detailing all of the other fraudulent charges, including (i) the $4,818.50 spent on WWE WrestleMania tickets on November 14, 2014, (ii) the $9,368.69 spent at Restoration Hardware on September 25, 2014, (iii) the $4,174.30 spent on UFC tickets on September 25, 2014, (iv) the $6,775.32 spent at Pottery Barn Teen on July 31, 2014, (v) the $16,339.81 spent at the Bellagio Hotel and Casino between June 3, 2014 and June 6, 2014, (vi) the $1,078.70 spent on Elton John tickets on June 14, 2014, (vii) the $8,710.81 spent at the Westin Mission Hills on April 28, 2014, (viii) the $7,365.00 spent at Frank Family Vineyards in Calistoga on April 23, 2014, (ix) the $6,498.95 spent at Disneyland on March 12, 2014, (x) the $5,152.80 spent on Country Mega Concert tickets on January 22, 2014, (xi) the $6,833.47

spent at The Ritz Carlton – San Francisco on January 5, 2014, (xii) the $13,273.26 spent at the Bellagio Hotel and Casino on December 29, 2013, (xiii) the $1,730.00 spent on Sacramento Kings tickets on December 17, 2013, and (xiv) the $12,723.37 spent (yet again) at Louis Vuitton on January 5, 2013.

25. Yet, arguably the most effective way to convey the true scale of the fraud is to detail the total amount of unauthorized charges. As to that, Ms. Howard and Mr. Brown incurred **$1,341,908.49** in charges on this tribal credit card from its issuance date onward, all but a negligible amount (*i.e.*, less than $10,000) of which are purely personal in nature along the lines of those identified above. Despite this, all of these amounts were charged to and paid for by Berry Creek – unbeknownst to it – even though they almost without exception went to funding Ms. Howard and Mr. Brown's lavish lifestyle.

### B.    Christmas Party Gift Money

26. Each year from 2012 onwards, Berry Creek has held a Christmas party on its Reservation in order to provide an opportunity for the entire Tribe to come together and celebrate the Holidays as one.

27. To help cover the travel expenses for its geographically-diffuse membership, Berry Creek pays each adult tribal member $100 to attend. In 2012 and 2013, these payments were made in cash, and in years thereafter they were done in the form of checks made payable to the individual tribal members.

28. Berry Creek also provides a Christmas gift to each tribal member in a specified dollar amount each year. For instance, in calendar year 2016, the amount of the gift was $340. Each adult member of the Tribe has always received the amount of the gift via a check made payable to that individual in his or her name. However, tribal youth have the option of receiving either a pre-written check or a cash handout at the Christmas party since the majority of them seem to prefer the latter based upon the ease with which they can convert it into video games, toys, or other items they want to purchase for Christmas.

29. From 2012 to 2016, Ms. Howard and Mr. Brown were responsible for arranging the Christmas party. As part of this undertaking, each year Ms. Howard would call

the main bank at Berry Creek's gaming facility – *i.e.*, Gold Country Casino – to inform the teller of the amount of cash she needed to withdraw for purposes of the Christmas party. In each instance, Ms. Howard would request a superficially reasonably amount to cover all or most all of the $100 attendance payments and $340 gifts to tribal youths. However, Ms. Howard would not inform the casino personnel with whom she was speaking that some or all of the foregoing amounts were actually covered by checks issued at the tribal level. Then, after giving the casino employees sufficient time to compile the funds, Ms. Howard would venture down to Gold Country Casino and retrieve the money.

30. This practice resulted in a startling imbalance between the cash withdrawn and the amount of money needed to cover the cash distributions at the Christmas party. To illustrate, in 2016, the adult tribal members received both their $100 attendance payments and their $340 Christmas gifts via checks. Conversely, 77 of the 236 tribal youth received their $340 Christmas gifts in the form of pre-written checks while the remaining 159 received cash payments at the Christmas party. Thus, the only cash Ms. Howard needed to withdraw from the main bank at Gold Country Casino was an amount sufficient to cover the 159 $340 cash handouts to tribal youth who elected to receive their gifts in that form – or $54,060. Yet, the total amount of money *actually* withdrawn by Ms. Howard from the main bank at Gold Country Casino on December 6, 2016 was instead $96,900, which reflects an additional **$42,840**. The table below provides a breakdown of the relevant data for the 2016 Christmas party.

| | |
|---|---|
| **Total Number of Adult Tribal Members** | 360 |
| Total Number of Adult Attendance Checks Written | 179 |
| Attendance Amount | $100 |
| Aggregate Amount of Attendance Checks | $17,900 |
| Total Number of Adult Gift Checks Written | 359 |
| Gift Amount | $340 |
| Aggregate Amount of Adult Gift Checks | $122,060 |
| **Total Number of Tribal Youth** | 236 |
| Total Number of Youth Gift Checks Written | 77 |
| Total Number of Youth Cash Gifts Issued | 159 |
| Gift Amount | $340 |

Case No.: _____

COMPLAINT OF BERRY CREEK RANCHERIA

| Aggregate Amount of Youth Cash Gifts | $54,060 |
| Ms. Howard's December 6, 2016 Withdrawal | $96,900 |
| Difference | $42,840 |

31. Despite possessing this $42,840 in additional tribal funds, Ms. Howard did not return *any* portion of this amount to the main bank at Berry Creek's gaming facility from which she withdrew it, or any deposit account maintained by the Tribe for that matter. Rather, it is believed that Ms. Howard took this money and deposited it into either her or Mr. Brown's bank account at another financial institution in the days immediately following the Christmas party, which was accomplished by the bank using the wires to credit such funds to the respective account.

32. Ms. Howard acted in the same manner for the Christmas parties in years 2012 to 2015 (*i.e.*, using the wires to arrange the withdrawal of substantially more in cash than was actually distributed), which in turn means that she received roughly **$224,036.00** in tribal funds that should have – but were not – returned to the Tribe.

## C.    Smoke Shop Deposits

33. Berry Creek opened a drive-through store for selling cigarettes to predominantly automotive passerbys (*i.e.*, "Smoke Shop") on its Reservation on July 2, 2012.

34. The sales made at the Smoke Shop come in two forms: purely cash transactions by customers using the drive-through that are immediately recorded by a point of sale system, and checks issued by businesses in the area that buy the Smoke Shop's products in wholesale amounts. For instance, Gold Country Casino has traditionally bought cigarettes from the Smoke Shop to sell at the convenience stores located within the facility. Similarly, other local businesses do the same, writing checks of typically substantial dollar amounts to the Smoke Shop in order to purchase large quantities of cigarettes.

35. Ms. Howard was responsible for collecting the cash and checks received by the Smoke Shop and then depositing the same into a specified bank account for Berry Creek, often with the assistance of Mr. Brown. What Ms. Howard would routinely do is call the Smoke Shop every business day to determine whether a certain threshold of cash was on

hand, and then accordingly venture down to the Smoke Shop every business day or other business day to collect the accumulated monetary instruments, return them to a safe in her and Mr. Brown's possession at the tribal Administrative Building, and then ultimately transport (part of) the same to the bank for deposit.

36. Yet, a comparison of the cash and business checks received by the Smoke Shop to the actual deposits at the relevant financial institution reveals that Ms. Howard never deposited much of the collected cash into Berry Creek's bank account. For example, the table below depicts the foregoing Smoke Shop information for the month of May 2017:

| Cash Sales | | Business Checks | | Deposits | |
|---|---|---|---|---|---|
| Date | Amount | Date | Amount | Date | Amount |
| 5/1 | $7,208.15 | 5/1 | $10,224.00 | | |
| 5/2 | $4,759.55 | | | 5/2 | $11,969.49 |
| 5/3 | $7,967.20 | | | | |
| 5/4 | $7,291.94 | | | | |
| 5/5 | $5,989.38 | | | | |
| 5/6 | $5,010.85 | | | | |
| 5/7 | $1,936.53 | | | | |
| 5/8 | | 5/8 | $18,120.00 | | |
| 5/9 | $1,249.50 | | | 5/9 | $7,241.00 |
| 5/10 | $4,631.22 | | | 5/9 | $12,856.80 |
| 5/11 | $5,053.60 | | | 5/9 | $20,208.35 |
| 5/12 | $4,960.48 | | | | |
| 5/13 | $5,942.12 | | | | |
| 5/14 | $3,688.42 | | | | |
| 5/15 | $5,601.69 | | | | |
| 5/16 | $4,488.35 | | | 5/16 | $5,865.97 |
| 5/17 | $4,719.58 | | | 5/16 | $17,762.68 |
| 5/18 | $5,409.99 | | | | |
| 5/19 | $6,382.39 | | | | |
| 5/20 | $3,724.60 | | | | |
| 5/21 | $4,956.23 | | | | |
| 5/22 | $4,283.16 | 5/22 | $20,856.00 | | |
| 5/23 | $5,303.97 | | | 5/23 | $5,396.73 |
| 5/24 | $5,156.16 | | | 5/23 | $7,558.75 |
| 5/25 | $5,164.46 | | | 5/23 | $9,198.11 |
| 5/26 | $4,875.35 | | | 5/23 | $15,040.96 |

Case No.: _____

COMPLAINT OF BERRY CREEK RANCHERIA

| 5/27 | $4,576.24 | | | | |
| 5/28 | $4,525.94 | | | | |
| 5/29 | $5,519.44 | | | | |
| 5/30 | $4,953.10 | 5/30 | $2,880.00 | 5/30 | $5,161.03 |
| 5/31 | $5,424.99 | | | 5/30 | $5,164.73 |
| | | | | 5/30 | $9,579.67 |
| | | | | 5/30 | $17,275.70 |
| | **$150,489.20** | | **$52,080.00** | | **$150,279.97** |

This information shows that the Smoke Shop generated $150,489.20 in cash sales, received an additional $52,080.00 in business checks, and yet only had $150,279.97 in actual deposits. Thus, there is a difference between the receipts and deposits for this one-month period of **$52,289.23**. Even if some or all of the cash and checks received on 5/30 or 5/31 were actually deposited at the beginning of the following month (which is not a given for the cash receipts since there are no numerically corresponding deposits during the relevant time), the revenue-to-deposit differential is still approximately $40,000.00.

37. If one conducts this comparison from the opening of the Smoke Shop on July 2, 2012 through the date of Ms. Howard's departure from the Tribe (*i.e.*, July 22, 2017), the data shows that the Smoke Shop had $4,230,105.08 in cash sales according to its point of sale system, $692,256 in checks from Gold Country Casino, $1,003,399.09 in business checks from other local businesses, and yet only $4,783,895.94 in actual deposits. After subtracting both categories of business checks from the total deposits, what this means is that **$1,141,864.23** of the cash generated by the Smoke Shop and provided to Ms. Howard for deposit never actually made it into Berry Creek's bank accounts. Rather, it is believed that Ms. Howard took this money and deposited it into either her or Mr. Brown's bank account at another financial institution in the days immediately following receipt, which was accomplished by the bank using the wires to credit such funds to the respective account.

**D.    Payroll Double or Triple Dips**

38. Another essential function performed by Ms. Howard in her position as CFO of Berry Creek was having chief oversight of the Tribe's payroll system. In this capacity,

she had the ability to change or cause to be changed the payroll disbursements to any individual employee, including both herself and Mr. Brown.

39. Ms. Howard and Mr. Brown were both salaried employees at Berry Creek who were paid on a set schedule. However, the actual payroll entries for Ms. Howard and Mr. Brown during their tenures at Berry Creek reflect more than just the receipt of these negotiated periodic salaries. Rather, these two individuals also received a number of unauthorized disbursements that were either (1) in a dollar amount different from their periodic salaries, (2) in addition to such salaries, or (3) made under unusual and inapt headings – like for "professional fees, salaries, and wages" – that suggest the employee in question was paying him or herself compensation for being an outside professional on top of his or her negotiated in-house salary.

40. In fact, if one removes the standard payroll disbursements, the table below details the unauthorized disbursements falling into one of the three categories mentioned above that Berry Creek directly deposited into Mr. Brown and Ms. Howard's bank accounts with the aid of the wires just during the two-year period of September 2015 to September 2017.

| Jesse Brown | | Deborah Howard | |
|---|---|---|---|
| Date | Amount | Date | Amount |
| | | 8/8/2017 | $4,190.65 |
| | | 7/10/2017 | $2,448.57 |
| | | 3/17/2017 | $950.00 |
| | | 2/14/2017 | $2,441.20 |
| 1/25/2017 | $2,267.76 | | |
| | | 12/22/2016 | $1,054.37 |
| 12/19/2016 | $3,000.00 | 12/19/2016 | $5,000.00 |
| 12/19/2016 | $500.00 | 12/19/2016 | $500.00 |
| 11/21/2016 | $896.67 | 11/21/2016 | $650.00 |
| 11/21/2016 | $650.00 | | |
| 10/27/2017 | $650.00 | 10/27/2017 | $650.00 |
| 9/16/2016 | $5,688.56 | | |
| | | 9/6/2016 | $905.78 |
| 6/16/2016 | $650.00 | 6/16/2016 | $650.00 |

14                     Case No.: _____
COMPLAINT OF BERRY CREEK RANCHERIA

| | | | |
|---|---|---|---|
| 5/18/2016 | $4,550.84 | | |
| 3/31/2016 | $650.00 | 3/31/2016 | $350.00 |
| | | 2/26/2016 | $3,680.11 |
| | | 2/19/2016 | $3,680.11 |
| 12/23/2015 | $3,007.55 | 12/23/2015 | $3,130.11 |
| 12/8/2015 | $2,500.00 | | |
| | | 12/4/2015 | $3,500.00 |
| 12/1/2015 | $1,000.00 | 12/1/2015 | $2,000.00 |
| 12/1/2015 | $500.00 | 12/1/2015 | $650.00 |
| 9/8/2015 | $500.00 | 9/8/2015 | $650.00 |

41. It is worth noting that some of these unauthorized disbursements overlap with the time periods in which Ms. Howard and Mr. Brown were going on the extravagant vacations detailed in Paragraphs 20 and 21, *supra*. In other words, Ms. Howard would tamper with the payroll system in advance to provide herself and Mr. Brown with additional compensation, they would head out on luxurious vacations that – unbeknownst to it – the Tribe was paying for on an undisclosed tribal credit card, and then they would withdraw the extra monies provided by these unauthorized payroll distributions (often in different states) so they could better enjoy their already subsidized vacations.

42. All told, the total amount of unauthorized payroll distributions Ms. Howard and Ms. Brown paid to themselves during their tenures at Berry Creek are **$140,305.35** and **$106,562.76**, respectively.

## III. AFTERMATH FOR MS. HOWARD AND MR. BROWN

43. All of this fraud only came to light because of chance. The 2016 annual audit of Berry Creek that had to be completed by September 30th of the following year indicated unreconciled credit card expenses on the credit cards known to be in the Tribe's name.

44. In the months prior to the issuance of this financial report, both Mr. Brown and Ms. Howard had left their positions as TA and CFO of Berry Creek, respectively.

45. As a result of this disclosure about unreconciled credit card expenses, the Tribal Council sought to obtain bank statements for all of the tribal credit cards. However, it

encountered significant difficulties in accomplishing this because Ms. Howard and Mr. Brown had designated themselves as the only individuals authorized to access the accounts.

46. Changing the account designees was an involved process that took a substantial amount of time, but the Tribal Council finally succeeded in doing so and obtaining the desired credit card statements, discovering in the process that Mr. Brown had the secret credit card discussed throughout this Complaint with the $1.3 million in expenditures that were *not* included in the 2016 annual audit.

47. The discovery of this previously unknown credit card led the Tribal Council to conduct a more thorough investigation of its financial accounts, through which it learned of the issues discussed in Sections II(B)-(D), *supra*, regarding the missing Christmas gift money, the Smoke Shop cash receipts that were never deposited, and the unauthorized payroll payments.

48. Following their departures from Berry Creek, Ms. Howard and Mr. Brown – who have since married – have used the tribal funds with which they absconded to start at least two different businesses: a women's clothing boutique in downtown Gridley named the Makeup Room & Company, and a self-described "upscale full-service bar" in historic Oroville known as The Exchange.

**FIRST CLAIM FOR RELIEF**

**[Conducting or Participating in an Enterprise's Affairs through Racketeering Activity in Violation of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961 *et seq.*)]**

**[Against Deborah Howard and Jesse Brown]**

49. Berry Creek incorporates by reference the preceding general allegations as if set forth in full.

50. A *prima facie* RICO case requires that the plaintiff show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Avalos v. Baca*, 596 F.3d 583, 592 (9th Cir. 2010) (citing *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 620 (9th

Cir. 2004)). A "pattern" of racketeering activity requires proof of "at least two [predicate] acts of racketeering activity" within ten years of each other. *See* 18 U.S.C. § 1961(5). A predicate act of racketeering activity is defined as any act indictable under specified provisions of Title 18 of the United States Code, "and includes the predicate acts of mail [and] wire fraud." *Cochran Firm P.C. v. McMurray*, 2014 U.S. Dist. Lexis 194663, *17 (C.D. Cal. 2014) (quoting *Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004)). To allege a violation of mail or wire fraud under 18 U.S.C. §§ 1341 or 1343, a plaintiff must show "(1) there was a scheme to defraud; (2) the defendants used the mail (or wire, radio, or television), in furtherance of the scheme; and (3) the defendants acted with the specific intent to deceive or defraud." *Cochran Firm P.C.*, 2014 U.S. Dist. Lexis 194663 at *18-*19 (citing *Yokohama Tire Corp.*, 358 F.3d at 620). Similarly, the list of qualifying predicate acts also includes money laundering (*see JW Gaming Dev., LLC v. James,* 2018 U.S. Dist. Lexis 172773, *17-*18 (N.D. Cal. 2018), *aff'd by* 778 F. App'x 545 (9th Cir. 2019)), an offense consisting of the following four elements under 18 U.S.C. § 1957: (i) the defendant  knowingly engaged in a monetary transaction; (ii) he knew the transaction involved criminal property; (iii) the property's value exceeded $10,000; and (iv) the property was derived from a specified unlawful activity. *United States v. Rogers,* 321 F.3d 1226, 1229 (9th Cir. 2003). The $10,000 requirement of the foregoing test is simply a threshold figure that can be met by either looking at the value of a single transaction or all related transactions in the aggregate. *See Chowdhury v. INS,* 249 F.3d 970, 971 (9th Cir. 2001). Further, a "specific unlawful activity" as that term is used in the final element of the test can include the misappropriation of funds even if the business itself was not engaged in unlawful activity. *See JW Gaming Dev.,* 2018 U.S. Dist. Lexis 172773 at *18 (citing *Best Deals on TV, Inc. v. Naveed,* 2007 WL 2825652, *8 (N.D. Cal. Sept. 26, 2007)). In passing RICO, Congress mandated that "the provisions of this title shall be liberally construed to effectuate its remedial purposes." *See* Organized Crime Control Act of 1970, Pub. L. No. 91-452, § 904(a), 84 Stat. 947 (1970).

51. The abovenamed Defendants are individuals associated in fact who have par-

ticipated in or otherwise conducted an enterprise designed to misappropriate funds from Berry Creek for their own personal benefit through a pattern of wire fraud and/or money laundering.

52. As to that, each of the Defendants has engaged in at least two acts or wire fraud or money laundering during the past ten years, which are detailed throughout the General Allegations, *supra*, and include amongst other things:

(a) using the wires to make hundreds if not thousands of unauthorized personal charges on a secret credit card in Berry Creek's name totaling more than $1.3 million from 2011 to 2016;

(b) laundering more than $1.3 million in misappropriated funds from Berry Creek through hundreds if not thousands of unauthorized personal credit card transactions from 2011 to 2016, many of which exceeded $10,000 individually;

(c) using the wires to arrange and subsequently deposit into their own personal bank accounts cash withdrawals of $220,000 in Berry Creek funds that were supposed to be used to provide Christmas gifts for the tribal youth, which the Defendants did at or around the same time each year for five consecutive years from 2012 to 2016;

(d) laundering more than $220,000 in misappropriated funds from Berry Creek that were supposed to be used to provide Christmas gifts for tribal youths through a series of five annual withdrawals from 2012 to 2016, each of which was over $10,000 individually;

(e) using the wires to arrange and subsequently deposit into their own personal bank accounts more than $1.1 million in cash receipts from the Smoke Shop operated by Berry Creek, which the Defendants did on a regular basis from the opening of the facility on July 2, 2012 through the termination of Ms. Howard in 2017;

(f) laundering more than $1.1 million in misappropriated funds from Berry Creek's Smoke Shop that were intended for deposit into the Tribe's bank accounts

Case No.: _____

COMPLAINT OF BERRY CREEK RANCHERIA

through a continuing series of transactions from the opening of the facility on July 2, 2012 through the termination of Ms. Howard in 2017, many of which exceeded $10,000 individually;

(g) using the wires to manipulate Berry Creek's payroll system to provide themselves with unauthorized compensation above and beyond their negotiated salaries that totaled more than $240,000, which continued for years and through the summer of 2017; and,

(h) laundering more than $240,000 in misappropriated funds from Berry Creek by authorizing excess payroll distributions to themselves on the Tribe's payroll system as late as 2017, some of which that occurred in close proximity totaled in excess of $10,000 alone;

53. The aforesaid predicate acts and others evidence a six-plus year scheme by common actors (*i.e.*, Defendants) against a common victim (*i.e.*, Berry Creek) done for a common purpose (*i.e.*, defrauding Berry Creek), which the aforesaid actors intended to carry out and did, in fact, carry out.

54. The abovenamed Defendants' violations of the Racketeer Influenced and Corrupt Organizations Act have caused Berry Creek to suffer actual damages totaling at least $2,954,676.83, which the district judge or a jury, as the case may be, can redress in accordance with the Prayer for Relief, *infra*.

## SECOND CLAIM FOR RELIEF

### [Conversion]

### [Against Deborah Howard and Jesse Brown]

55. Berry Creek incorporates by reference the preceding general allegations as if set forth in full.

56. Conversion is the wrongful exercise of dominion over the property of another and has the following three elements: (1) the plaintiff's ownership or right to possession of property; (2) the defendant's conversion by wrongful act or disposition of property rights; and (3) damages. *See, e.g., Burlesci v. Petersen,* 68 Cal. App. 4th 1062, 1066 (1st

Dist. 1998); *accord Oakdale Village Group v. Fong,* 43 Cal. App. 4th 539, 543 (3d Dist. 1996).

57. Berry Creek maintained bank accounts during the time periods in question, the funds therein the Defendants could only access and/or use as part of their employ for specific business or governmental purposes related to their positions.

58. And yet, the abovenamed Defendants converted these funds to their own personal monies through four discreet and unlawful schemes involving hundreds if not thousands of unlawful acts or transactions: (1) using a secret tribal credit card to make more than $1.3 million in personal expenditures; (2) misappropriating over $200,000 in cash withdrawals meant to provide Christmas gifts to tribal youth; (3) skimming more than $1.1 million of cash receipts from the Smoke Shop operated by Berry Creek before depositing the remainder of the funds into the Tribe's bank account; and (4) giving themselves upwards of $250,000 in unauthorized salary distributions by manipulating the payroll system used by Berry Creek.

59. The abovenamed Defendants' unlawful conversion of Berry Creek's property has caused the Tribe to suffer actual damages totaling at least $2,954,676.83, which the district judge or a jury, as the case may be, can redress in accordance with the Prayer for Relief, *infra*.

### THIRD CLAIM FOR RELIEF

### [Unjust Enrichment]

### [Against Deborah Howard and Jesse Brown]

60. Berry Creek incorporates by reference the preceding general allegations as if set forth in full.

61. "The elements of a cause of action for unjust enrichment are simply stated as 'receipt of a benefit and unjust retention of the benefit at the expense of another.'" *Prof'l Tax Appeal v. Kennedy-Wilson Holdings, Inc.,* 29 Cal. App. 5th 230, 238 (2d Dist. 2018) (citing *Lectrodryer v. Seoulbank,* 77 Cal. App. 4th 723, 726 (2d Dist. 2000)); *see Prakashpalan v. Engstrom, Lipscomb & Lack,* 223 Cal. App. 4th 1105, 1132 (2d Dist.

2014); *Elder v. Pac. Bell Telephone Co.,* 205 Cal. App. 4th 841, 857 (1st Dist. 2012); *Peterson v. Cellco P'ship,* 164 Cal. App. 4th 1583, 1593 (4th Dist. 2008).

62. The abovenamed Defendants used their executive positions at the top of Berry Creek's managerial hierarchy to covertly receive benefits they were neither entitled to nor earned through their respective positions: (1) using a secret tribal credit card to make more than $1.3 million in personal expenditures; (2) misappropriating over $200,000 in cash withdrawals meant to provide Christmas gifts to tribal youth; (3) skimming more than $1.1 million of cash receipts from the Smoke Shop operated by Berry Creek before depositing the remainder of the funds into the Tribe's bank account; and (4) giving themselves upwards of $250,000 in unauthorized salary distributions by manipulating the payroll system used by Berry Creek.

63. These benefits have been retained by the Defendants, used by them in opening multiple new businesses after leaving their positions at Berry Creek, and should be disgorged since allowing the continued retention of them would be manifestly unjust given both the confidential nature of the positions previously occupied by the Defendants and the fact that such benefits were never authorized in the first place.

64. The abovenamed Defendants' unlawful receipt and retention of funds belonging to Berry Creek has caused the Tribe to suffer actual damages totaling at least $2,954,676.83, which the district judge or a jury, as the case may be, can redress in accordance with the Prayer for Relief, *infra*.

**FOURTH CLAIM FOR RELIEF**

**[Fraudulent Deceit]**

**[Against Deborah Howard and Jesse Brown]**

65. Berry Creek incorporates by reference the preceding general allegations as if set forth in full.

66. The elements of fraud are: "(1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, *i.e.*, to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Robinson Heli-*

21                     Case No.: _____

COMPLAINT OF BERRY CREEK RANCHERIA

*copter Co. v. Dana Corp*., 34 Cal. 4th 979, 990 (2004) (citing *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996)). As the foregoing types of misrepresentations should indicate, actionable fraud exists not just when a party to a transaction makes a misrepresentation, but when it actively conceals a material fact or speaks in part but "suppresses facts which materially qualify the facts stated." *Persson v. Smart Inventions, Inc.,* 125 Cal. 4th 1141, 1165 (2005); *see, e.g., Warner Const. Corp. v. City of L.A.,* 2 Cal. 3d 285, 294 (1970).

67. The abovenamed Defendants made a litany of material misrepresentations by failing to disclose and, in fact, actively concealing that they were utilizing Berry Creek's funds for personal purposes by: (1) using a secret tribal credit card to make more than $1.3 million in personal expenditures; (2) misappropriating over $200,000 in cash withdrawals meant to provide Christmas gifts to tribal youth; (3) skimming more than $1.1 million of cash receipts from the Smoke Shop operated by Berry Creek before depositing the remainder of the funds into the Tribe's bank account; and (4) giving themselves upwards of $250,000 in unauthorized salary distributions by manipulating the payroll system used by Berry Creek.

68. The abovenamed Defendants knew these misrepresentations – including the material omissions and active concealment – were false given that the nature of their positions did not authorize them to use Berry Creek's funds for personal purposes, and that they took additional measures to ensure that Berry Creek would not find out about their actions – such as by Ms. Howard unilaterally issuing the secret tribal credit card to Mr. Brown and, in connection therewith, the Defendants designating themselves as the only individuals authorized to access this account or any information connected therewith.

69. The abovenamed Defendants engaged in this pattern of misrepresentations – including the material omissions and active concealment – so they could continue their course of conduct for as long as possible while maximize the amount of funds they could misappropriate from Berry Creek during that time.

70. Berry Creek justifiably relied upon these misrepresentation – including the material omissions and active concealment – both because the Defendants occupied posi-

tions of trust and/or confidence within the tribal governmental structure and because the Tribe would not have permitted the Defendants to continue to use millions of dollars of tribal funds for personal purposes had it known this was occurring (especially given the needs of its historically-impoverished membership).

71. The abovenamed Defendants' commission of fraudulent deceit has caused Berry Creek to suffer actual damages totaling at least $2,954,676.83, which the district judge or a jury, as the case may be, can redress in accordance with the Prayer for Relief, *infra*.

### FIFTH CLAIM FOR RELIEF
### [Constructive Fraud]
### [Against Deborah Howard and Jesse Brown]

72. Berry Creek incorporates by reference the preceding general allegations as if set forth in full.

73. "[A]s a general principle constructive fraud comprises any act, omission or concealment involving a breach of legal or equitable duty, trust or confidence which results in damages to another even though the conduct is not otherwise fraudulent." *Salahutdin v. Valley of Cal., Inc.*, 24 Cal. App. 4th 555, 562 (1st Dist. 1994) (citation omitted). "Most acts by an agent in breach of his fiduciary duties constitute constructive fraud." *Id*. In fact, if a fiduciary relationship exists, *any* concealment of material fact constitutes constructive fraud. *See, e.g., Byrum v. Brand,* 219 Cal. App. 3d 926, 938 (4th Dist. 199).

74. The abovenamed Defendants occupied positions of trust and/or confidence with respect to Berry Creek given that Ms. Howard and Mr. Brown were charged with overseeing the Tribe's finances and subordinate non-gaming business enterprises, respectively.

75. Despite occupying such positions of trust and/or confidence and thus being fiduciaries, the abovenamed Defendants breached their fiduciary duties in failing to disclose that they were using Berry Creek funds for personal purposes by: (1) using a secret

tribal credit card to make more than $1.3 million in personal expenditures; (2) misappropriating over $200,000 in cash withdrawals meant to provide Christmas gifts to tribal youth; (3) skimming more than $1.1 million of cash receipts from the Smoke Shop operated by Berry Creek before depositing the remainder of the funds into the Tribe's bank account; and (4) giving themselves upwards of $250,000 in unauthorized salary distributions by manipulating the payroll system used by Berry Creek.

76. The abovenamed Defendants' commission of fraud as a result of the violation of their fiduciary duties has caused Berry Creek to suffer actual damages totaling at least $2,954,676.83, which the district judge or a jury, as the case may be, can redress in accordance with the Prayer for Relief, *infra*.

## PRAYER FOR RELIEF

WHEREFORE, the Berry Creek Rancheria of Maidu Indians of California prays as follows:

1. That the Court award actual damages (including restitution and/or disgorgement) under the State law claims in an amount of at least **$2,954,676.83** against Jesse Brown and Deborah Howard jointly and severally;

2. That the Court award punitive damages under the State law claims using a multiplier of nine (or the maximum otherwise allowed by law), and thus in an amount of at least **$26,529,091.47** against Jesse Brown and Deborah Howard jointly and severally;

3. That the Court award treble damages under RICO in an amount of at least **$8,864,030.49** against Jesse Brown and Deborah Howard jointly and severally;

4. That the Court award any and all other damages, whether foreseen or unforeseen, that naturally flowed from the Defendants' misconduct, including any consequential damages;

5. That the Court award pre- and post-judgment interest at the maximum rate permitted by federal or State law, whichever is higher at the time of judgment;

6. That the Court award reasonable attorney's fees under RICO or as otherwise allowed by law or equity; and

7. That the Court award such other legal or equitable relief as it deems appropriate, as justice requires, or as the law allows.

RESPECTFULLY SUBMITTED this 22nd day of October, 2020

WILLIAMS & COCHRANE, LLP

By: */s/ Cheryl A. Williams*
Cheryl A. Williams
Kevin M. Cochrane
caw@williamscochrane.com
kmc@williamscochrane.com
WILLIAMS & COCHRANE, LLP
28581 Old Town Front Street
Temecula, CA 92590
Telephone: (619) 793-4809

Case No.: _____
COMPLAINT OF BERRY CREEK RANCHERIA